UNITED STATES of America,

v.

Francis CROWLEY and Steven Valjato, Defendants.

No. 99–CR–0050 JS.

United States District Court, E.D. New York.

Dec. 13, 1999.

Debra D. Newman, Asst. United States Attorney, Garden City, NY, for the United States.

Edward M. Shaw, New York City, for defendant Francis Crowley.

Thomas F. Liotti, Garden City, NY, for defendant Steven Valjato.

## MEMORANDUM & DECISION

SEYBERT, District Judge.

Pending before the Court are the post-trial motions of defendants Francis Crowley ("Crowley") and Steven Valjato ("Valjato") for a judgment of acquittal or, in the alternative, for a new trial, pursuant to Fed.R.Crim.P. 29 and 33, respectively. Crowley and Valjato were convicted by a jury on July 15, 1999 of one count each of attempted aggravated sexual abuse, in violation of 18 U.S.C. § 2241(a), and one count each of attempted sexual abuse, in violation of 18 U.S.C. § 2242(1). The jury returned verdicts of not guilty as to the remaining counts of abusive sexual contact, 18 U.S.C. § 2244(a). For the reasons discussed below, the motions are granted in part and denied in part.

### BACKGROUND

## A. THE STATUTES

Count One of the indictment[1] charged the defendants with aggravated sexual abuse in violation 18 U.S.C. § 2241(a)(1). This statute provides that "[w]hoever, in the special maritime and territorial jurisdiction of the United States ... knowingly causes another person to engage in a sexual act—(1) by using force against that other person; ... or attempts to do so, shall be fined under this title, imprisoned for any term of years or life, or both." 18 U.S.C. § 2241(a)(1). In relevant part, the statute defines "sexual act" as "contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus," and also "the penetration, however slight, of the anal or genital opening of another by a hand or a finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(2)(B and C). Defendants also were charged, under Count One, with violation of the federal aiding and abetting statute, 18 U.S.C. § 2. Both defendants were convicted of this count.

Count Two of the indictment[2] charged the defendants with sexual abuse in violation of 18 U.S.C. § 2242(1). This statute states that "[w]hoever, in the special maritime and territorial jurisdiction of the United States or in a Federal prison, knowingly—(1) causes another person to engage in a sexual act by threatening or placing that other person in fear ..., or attempts to do so, shall be fined under this title, imprisoned not more than 20 years, or both." 18 U.S.C. § 2242(1). Defendants also were charged, under this count, with violation of the federal aiding and abetting statute, 18 U.S.C. § 2. Both defendants were convicted of this count.

However, the jury acquitted both defendants of Counts Three and Four of the indictment. Count Three charged the defendants with abusive sexual contact in violation of 18 U.S.C. § 2244(a)(1);[3] while

1. Count One of the indictment states: "COUNT ONE (Aggravated Sexual Abuse) [ ] On or about September 28, 1997, within the Eastern District of New York, the defendants FRANCIS CROWLEY and STEVEN VALJATO, in the special maritime and territorial jurisdiction of the United States, to wit: the United States Merchant Marine Academy at Kings Point, New York, did knowingly and intentionally attempt to cause another person to engage in a sexual act by using force against that other person. (Title 18, United States Code, Sections 2241(a)(1), 2 and 3551 et seq.)"

2. Count Two of the indictment states: "COUNT TWO (Sexual Abuse) [ ] On or about September 28, 1997, within the Eastern District of New York, the defendants FRANCIS CROWLEY and STEVEN VALJATO, in the special maritime and territorial jurisdiction of the United States, to wit: the United States Merchant Marine Academy at Kings Point, New York, did knowingly and intentionally attempt to cause another person to engage in a sexual act by threatening and placing that other person in fear. (Title 18, United States Code, Sections 2242(1), 2 and 3551 et seq.)"

3. Section 2244(a)(1) states in relevant part that "[w]hoever, in the special maritime and territorial jurisdiction of the United States ... knowingly engages in or causes sexual contact with or by another person, if so to do would violate—(1) section 2241 of this title had the sexual contact been a sexual act, shall

Count Four charged them with abusive sexual contact in violation of 18 U.S.C. § 2244(a)(2).[4]

The statutes relevant to Counts Three and Four prohibit unlawful sexual contact. The statute defines "sexual contact" as "the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(3). Counts Three and Four also charged the defendants with violation of the aiding and abetting statute, 18 U.S.C. § 2. As previously stated, both defendants were acquitted of Counts Three and Four.

## B. EVIDENCE PRESENTED AT TRIAL

The events giving rise to this prosecution occurred in late September 1997 at the United States Merchant Marine Academy ("Academy") in Kings Point, New York. Defendants Crowley and Valjato, as well as the complaining witness, Stephanie Vincent, were midshipmen at the Academy.

In the evening of Saturday, September 27, 1997, a large group of midshipmen, around thirty to sixty in number, had gathered at Kings Point Park, near the Academy grounds, to celebrate the Academy rugby team's victory earlier in the day. T. 72–73, 75, 641. According to one witness, the point of going to Kings Point Park on a Saturday evening was "to hang out and

drink." T. 621. It was very common for midshipmen under the age of twenty-one to drink. T. 653. One witness described the party as a "rugby drink-up," where after an athletic event someone would get a keg of beer and the teams would go somewhere to drink. T. 750.

Vincent had played a volleyball game earlier in the day, later had attended an Academy football game,[5] and around 8:30 p.m. went to Kings Point Park with members of her volleyball team. T. 72–73. Jennifer Bechtel, Vincent's roommate, also was at the park, as was defendant Crowley. T. 74. Vincent saw Bechtel and Crowley talking with each other at the park. T. 74. Vincent did not see defendant Valjato at the park that night. T. 75. Prior to this time, Vincent knew Crowley by his name and face, but had never socialized with him. T. 74. Vincent knew Valjato because they were in the same engineering section at school, and therefore had all of their classes together that term, but she had never socialized with him. T. 75, 197.

Exam week at the Academy was to commence the following Monday morning. T. 76. Thus, although there was plenty of beer at the park, Vincent limited herself to one or two beers because she planned on dedicating herself to studying all day on Sunday to prepare for exams. T. 76, 450.

Vincent left the park at around 9:30 or 10:00 p.m., and arrived back at the Academy at around 10:30 p.m. T. 78. She left the park with David Queally and Andrea Peer, catching a ride back to the Academy

---

4. Section 2244(a)(2) states in relevant part that "[w]hoever, in the special maritime and territorial jurisdiction of the United States … knowingly engages in or causes sexual contact with or by another person, if so to do would violate—… (2) section 2242 of this title had the sexual contact been a sexual act, shall be fined under this title, imprisoned not more than three years, or both." 18 U.S.C. § 2244(a)(2).

be fined under this title, imprisoned not more than ten years, or both." 18 U.S.C. § 2244(a)(1).

5. At the time of these events, Vincent weighed 135–140 lbs. T. 164. She is five feet eight inches tall. T. 164. She competed in cross-country in high school and during her freshman year at the Academy, played volleyball her sophomore year, and received self-defense training at the Academy. T. 164. Steven Valjato was a member of the football team and at the time of these events weighed 230 lbs. T. 786, 111.

in Queally's car. T. 77. Peer, a freshman, was a member of Vincent's volleyball team. T. 77, 73. Although Peer was a first-year "plebe," and thus not permitted to socialize with non-freshmen, she nevertheless had attended the party and had socialized with a number of upperclassmen, including Vincent. T. 77, 78. Upon arriving at the Academy, Vincent took Peer to Vincent's room, and attempted to find someone to help Peer return to her own room, because Peer was very intoxicated. T. 78, 172. After commending Peer to the care of two freshmen who lived on Vincent's floor, Vincent returned to her room, which was located in Palmer Hall. T. 78, 71.

Bechtel, Vincent's roommate, arrived back to the room at around 11:00 or 11:15 p.m. T. 79. Bechtel later left the room for about ten minutes, and then returned, upset and crying. T. 79. Vincent testified that Bechtel appeared to be intoxicated, and that Bechtel later had told her that she had smoked marijuana that night. T. 295, 299, 539. Vincent did not speak to Bechtel about why she was crying, but instead continued to prepare for bed. T. 80. She went to bed at 11:30 p.m., wearing only a T-shirt and basketball shorts. T. 80. Bechtel went to bed at the same time. T. 80. Vincent testified that she locked the door because her bed was situated closest to the door and hall. T. 80. However, Bechtel testified that it was she who locked the door that night. T. 510.

The beds in the room were bunk-type beds, located five or six feet off the ground. T. 80. Vincent's bed was against the center wall. T. 80. Because there were no ladders, Vincent would go from the floor to her chair, then to her desk, then up to her bed in order to retire. T. 81. The other side of the bed was blocked by a cinder wall, as was the head of the bed. T. 81–82. The door to the room was at the foot of the bed. T. 82. There was approximately three feet between the top of Vincent's bed and the ceiling. T. 159. A functioning telephone also was in the room. T. 180.

Vincent awoke several hours later when her bedroom door opened. T. 82. She looked at the digital clock next to her pillow and determined that it was 4:51 a.m. T. 82. Upon hearing the door open, she looked across the room, approximately 10–12 feet, to Bechtel's bed. T. 82, 83. Although the lights were off, Vincent saw that Bechtel was in her bed, and then saw Francis Crowley in the room. T. 83.

Crowley approached Vincent's bedside and stood up on her desk. T. 83. He began calling, "Jen, Jen." T. 83. He repeated it twice. T. 191. Vincent replied that she was not Jennifer and that Jennifer was across the room. T. 83. Crowley then got down and went toward Bechtel's bed. T. 83. Vincent heard some talking, but could not make out what Crowley and Bechtel were saying. T. 84. She thought that Crowley was acting hyperactive, based on the way he was speaking and the look on his face. T. 192, 194. Vincent got down from her bed and exited the room. T. 84. Upon exiting the room, she saw Steven Valjato seated on the floor with his head against his knees, on the right-hand side of the door, resting against the door frame. T. 84, 196. Vincent thought it was strange that Valjato was outside her room at that time of day. T. 198. Without speaking to Valjato, Vincent continued down the hall to the bathroom. T. 85. Vincent was away from her room for about five to seven minutes. T. 292.

On her way back to her bedroom, Vincent again passed Valjato but neither one spoke to the other. T. 85. Vincent re-entered her room and went back to her bed. T. 85. Crowley was still at Bechtel's bedside speaking with Bechtel. T. 85, 292. Vincent could hear Crowley repeatedly saying to Bechtel, "let's party, let's go out, come on, let's smoke crack." T. 85–86. Bechtel did not respond to Crowley except to grumble and move around in the bed. T. 86.

Crowley then walked toward Vincent's bed. T. 86, 292. He stood on the chair

directly below her bed. T. 86. Crowley said to Vincent, "we have a problem here." T. 86. Vincent got down from her bed and went over to the door. T. 86, 292. Vincent and Crowley exited the room and went into the hallway. T. 87, 292. When the two entered the hallway, Valjato was standing near the stairway. T. 96. Crowley stood within the door frame to Vincent's room, and Vincent stood in the middle of the hallway. T. 96. The door to the room was partially open. T. 96.

Vincent asked Crowley what was going on. T. 96. Crowley responded by asking her to go out, saying "let's go out, come on, let's party, let's do drugs, come on, let's smoke crack." T. 96–97. Crowley made these statements over and over again. T. 97. Valjato also responded, saying "come on, let's do it, come on, let's go out with us." T. 97. Vincent told them that she did not know what was going on. T. 97. Vincent was annoyed by the fact that it was 5:00 a.m., she had to study all day that day, and was being asked to go party. T. 97.

Crowley then said to Vincent, "well, you are going to miss out on this. Steve, show her what you have." T. 98. Valjato responded, "Francis, you show her what you have." T. 98. At this point, both defendants pulled plastic bags out of their pants pockets. T. 98. Vincent was able to see inside Valjato's bag, but could not see inside Crowley's bag. T. 98–99. Valjato's bag appeared to contain marijuana. T. 99.

Vincent told Crowley and Valjato that this was not something that she could be a part of, and told them that they could do whatever they wanted, but that she was going back to her room. T. 100. Vincent was trying to be "politically correct" with the situation. T. 204. The defendants asked Vincent why she would not go party and do drugs with them, telling her that

because she was smart she would do well on the exams. T. 205. Valjato then asked Vincent if he and Crowley could "at least do it" in Vincent's room. T. 100. Vincent again stated that they could do what they wanted, but she was going back to her room to sleep. T. 100. Vincent then returned to her bed. T. 103. She did not lock her bedroom door. T. 208. The conversation in the hallway lasted approximately fifteen minutes. T. 206, 292. Neither defendant said anything about sex during the hallway conversation. T. 381.

At the time of these events and thereafter, Crowley was very hyperactive. T. 102, 323, 377. According to Vincent, he was "all agitated and distracted." T. 102. Crowley appeared to be intoxicated or stoned, although Vincent did not know whether or not he was under the influence of alcohol or some other substance. T. 302–03, 294. Vincent did not smell alcohol on Crowley's breath at anytime. T. 323. Valjato appeared to be "lethargic, very slow and concentrated." T. 102–03. Vincent did not have the opportunity to determine whether Valjato's breath smelled of alcohol because his mouth was never near Vincent's face. T. 323.

About a minute after Vincent returned to her bed, Crowley re-entered the room and came towards Vincent's bed. T. 103, 292. Crowley went directly up to her bed until he was within inches of her. T. 104. Crowley asked Vincent if she knew that Steven was leaving, and Vincent said she did. T. 104. Crowley then told Vincent that Valjato was "very angry" that she did not want to go out with them.[6] T. 104–05. Vincent replied that she was sorry, but that she had to study and she could not go out with them at the time. T. 105. Crowley then told Vincent that Valjato wanted to "go down" on her.[7] T. 105. Vincent

---

6. The jury was instructed that this statement was not admitted for truth of the matter asserted, that is, that the jury could not accept this statement as proof that Valjato was in fact angry that Vincent would not go out with them. T. 104–05.

7. The jury again was instructed that this statement was not admitted for truth of the matter asserted, that is, that the jury could not accept this statement as proof that Valjato did in fact want to "go down" on Vincent. T. 105–06.

understood this phrase to mean that Valjato wanted to perform oral sex on her. T. 106.

When Crowley made this last statement, he began to move over the top of Vincent and tried to get onto her bed. T. 106. Vincent backed away toward the wall and told Crowley to stop and to please leave. T. 106. Crowley started kissing her neck and fondling her breasts outside of her T-shirt. T. 106–07. Vincent pushed his hands down and told him to stop. T. 107. Crowley said to Vincent, "come on, I know you want us, come on, let us." T. 107. Vincent continued to tell Crowley "no, to stop, please leave," and persisted in pushing his hands away from her and backing up against the cinder wall. T. 107. The more Vincent resisted Crowley's actions, the more force he used. T. 107. Crowley did not have a weapon or dangerous instrument. T. 235. Crowley fondled Vincent's breasts and kissed her neck for approximately five to ten minutes. T. 292–93, 305. During this struggle, the bed continuously creaked as the wood shifted, making a lot of noise. T. 399.

Crowley then started to move his hand down into the waistband of Vincent's basketball shorts. T. 108. At this point, Vincent cried out to her roommate for help. T. 108. Vincent said "Jennifer, would you please come over and help me." T. 348. Bechtel did not respond. T. 108. Bechtel testified that she never heard Vincent cry out or ask her for help that night. T. 541. After Vincent called to her roommate for help, Crowley pushed Vincent back up towards the wall and told her not to freak out and that everything was going to be okay. T. 108. Crowley then touched Vincent's vagina and attempted to insert his finger. T. 108–09. Crowley was not able to do so. T. 109. Vincent continued to kick back against the wall and continued to try to push Crowley off. T. 109.

Crowley then called out "Steven, come over here." T. 109. Within seconds, Valjato came to the lower end of the bed, nearest the door. T. 110. When Valjato entered, Crowley still had his hand down Vincent's shorts and was still touching her vagina. T. 110. Valjato attempted to climb onto Vincent's bed, but was not able to because he slipped. T. 111. As he tried to climb onto the bed, Valjato stated, "come on, just let us do this." T. 112. Crowley took his hand out of Vincent's shorts and tried to help Valjato. T. 112. Crowley's other hand was still placed across Vincent's chest, on her breast. T. 112. At this point, both defendants were standing on Vincent's desk while she remained in her bed. T. 112. Vincent testified that she "felt as though the situation had escalated into something that I needed to [calm] down, [that] I had to rationalize with them and do something other than physical force, because I could not fight with Francis." T. 397. At no time did Vincent say that two people were fighting with her. T. 326.

While Crowley was touching Vincent, Valjato stood at the edge of the bed, saying "come on, just let us do this, let us go down on you. You will enjoy it." T. 113. Crowley was saying essentially the same thing. T. 114. Vincent told them that she would never do this with anybody. T. 114. Vincent was intimidated by the presence of both Crowley and Valjato at her bedside. T. 114. She continued to ask them to "please leave," but did not scream. T. 115.

While Vincent continued to tell Crowley and Valjato that she did not want them to perform oral sex on her and wanted them to leave, the two continued to beg. T. 116. Crowley stated "come on, just let us do this for five minutes, just for one minute. You will enjoy it, come on." T. 116. Valjato said the same. T. 116. Crowley attempted to pull down Vincent's basketball shorts but was not able to do so. T. 116–17. As Crowley attempted to pull down Vincent's shorts, he said "no, she is going to do that." T. 117. During this part of the incident, Valjato was standing next to Crowley. T. 117. There was some space in between the bodies of Crowley and Val-

jato while they were standing on the desk. T. 159.

Valjato then told Vincent that he had a tongue ring and that she would really enjoy it. T. 117. Vincent again replied that she was sorry, but it was something she would not do. T. 117. She told Valjato that she did not mean her refusal personally against either one of them, but that she simply wanted them to leave. T. 117. Valjato replied that nobody ever had turned him down. T. 118. Vincent testified that Valjato was upset and angry and that she felt threatened. T. 118.

Crowley and Valjato continued to hound Vincent, asking her to give them a reason why she would not consent to oral sex. T. 118. She told them that she had a boyfriend. T. 118. She also told them that she knew Valjato had a girlfriend, and wondered aloud how Valjato's girlfriend would feel about what they were trying to get her to do. T. 118.

Crowley, ever-persistent, said "who cares? Your boyfriend is not here and neither is Steve's girlfriend." T. 119. The two continued to repeat, over and over, "please let [us] go down on [you]." T. 119. Vincent kept saying no. T. 119. Finally, in an angry tone, Valjato told Crowley "that if she was not going to fucking do it, let's fucking go." T. 119. As he said these words, Valjato hit his fist against the bed frame. T. 119. Valjato then told Vincent that she "better never say anything that was said or done in this room, or it would be all over, and especially to Meg and Carol." [8] T. 120. Vincent understood these words to be a personal threat against her. T. 120. Meg and Carol were the only other female students in Vincent's engineering section at that time. T. 120.

Valjato never touched any part of Vincent's body. T. 113. Vincent testified that although Valjato "may have brushed up against my leg as he was trying to climb into my bed[,][h]e never placed his hands on me." T. 113.

Crowley then asked Vincent if she was mad, and Vincent told him that she was not. T. 120. Crowley then asked Vincent, "you wouldn't put me up for sexual harassment, would you?" T. 120. Crowley then laughed. T. 120. Vincent told Crowley that if he left, everything would be fine. T. 120.

Valjato got down from the desk, followed by Crowley, and the two then exited the room. T. 121. Vincent heard the door click, but she did not lock the door. T. 244–45. Vincent heard the sounds of their voices, whispering in the hall. T. 121. Francis Crowley then re-entered the room. T. 121. He returned atop Vincent's chair. T. 121–22. Crowley asked Vincent, "are you sure, come on, just let us do it. We will never bother you again; just let us do this." T. 122. Crowley told Vincent that Valjato was very angry.[9] T. 122. Vincent again told Crowley that she was sorry, that this was something she was not going to do. T. 123. She asked Crowley to please leave and everything would be fine. T. 123. Crowley then asked Vincent if she would call him the next day and Vincent said she would. T. 123. Vincent testified that she said this because she knew it was the only way Crowley would leave. T. 123. Crowley then left the room. T. 123. Vincent hit the clock and it was 6:12 a.m. T. 123.

Vincent listened for the door to click, and noticed that her roommate was still in bed across the room with her back toward Vincent. T. 124. Vincent did not lock the door. T. 246. She did not say anything to her roommate. T. 124. She did not call the police. T. 246. She did not contact the hourly floor watch patrol, nor did she

---

8. These two names probably were meant to appear in the transcript as "Megan Carroll," who was in Vincent and Valjato's section at school. T. 451–52.

9. The jury again was instructed that this statement was not admitted for truth of the matter asserted, that is, that the jury could not accept this statement as proof that Valjato was in fact angry. T. 123.

contact campus security. T. 246–47. Vincent lay in her bed wondering why "after that amount of time at that school, my third year, that I had ever given someone the notion that I would allow that to happen to me or that I would want that to happen to me." T. 123–25.

Jennifer Bechtel, Vincent's roommate, left the room at about 7:00 a.m. T. 125. The two did not speak. T. 125.

Around 9:00 a.m., Vincent went down the hallway to speak with her friend Elizabeth Johnsen. T. 125–26. However, Johnsen was still sleeping, so Vincent waited until 9:30 a.m. and then returned to Johnsen's room. T. 126. Vincent was upset, and told Johnsen what happened, although she did not go into all the details. T. 126. Vincent then left Johnsen's room, showered, got dressed and went to brunch. T. 126.

At brunch, Vincent saw her friend Diane Bonnar, and told her what happened. T. 127. Some time later, Vincent spoke to Megan Carroll, and at some point in the morning Vincent spoke to her parents by phone. T. 144, 146. Vincent told her parents what happened, and after speaking with them decided to report the incident to her commanding officer. T. 146. She went to her commanding officer's office on Sunday afternoon, but nobody was there. T. 147.

Although it is not exactly clear from the testimony, sometime after talking to her parents, and while she was studying, Vincent and Megan Carroll went to the vending machines to get coffee. T. 144. While they were getting coffee, Vincent saw Crowley walking towards them. T. 145, 454. Crowley asked her if everything was okay, if she was mad at him, and if they were still friends. T. 145. Crowley told Vincent that he did not know what had gotten into him that night. T. 145, 455. Crowley wanted to know if he could buy Vincent some coffee and wanted to know what she was doing. T. 145. Vincent said she was studying thermodynamics and that everything was fine. T. 145. Crow-

ley said he would help her make photocopies, and again asked if she was mad at him. T. 145, 455. She again told Crowley that everything was fine. T. 145, 455.

Sometime in the afternoon, after discovering that her commanding officer was not in his office, Vincent looked for her company officer, but could not locate him. T. 147. Instead, she looked at the watch bill to see who was on duty. T. 147. Vincent saw that Commander Funken was on duty, wrote down his phone number, and went back to her room. T. 148. She then called her parents and told them that the commanding officer was not around, but that she was going to call Commander Funken. T. 148. When Vincent called Funken, she only was able to reach his voice mail, so she left a message that there was an emergency and that she needed to speak with him immediately. T. 148. Vincent also called front gate security, but received no answer. T. 149. She also called her friend Linda Bulone at home. T. 149. Bulone previously had worked at the infirmary at the Academy. T. 149.

Around four or five that afternoon, Vincent received a phone call from Captain Robert Larson. T. 150. She met with Captain Larson in the library at around 7:00 p.m. and told him what had happened. T. 150. Captain Larson directed Vincent to return to her room and that she would be notified when he wanted to speak with her again. T. 150. Vincent was contacted again by Captain Larson at 9:00 p.m., after which she went to the Academy's administrative building. T. 150–51. Once she arrived, she again called her parents. T. 151. After speaking with her parents, Vincent called the Nassau County Police. T. 151.

Megan Carroll testified that she saw Vincent and Crowley talking to each other at the park the night before the incident. T. 450–51, 459. Carroll saw Vincent drink two beers within the course of an hour at the park. T. 450. The next day, around twelve noon, Carroll received a phone call

from Vincent. T. 453. She went to Vincent's room and observed that Vincent was very upset and had been crying. T. 453. Vincent told Carroll why she was upset. T. 453.

Sometime later, the two went to the vending machines to get coffee, where they ran into Crowley. T. 454. Vincent acted surprised to see him and put her hands up. T. 454. Vincent told Crowley that everything was fine. T. 455. Crowley told Vincent that he was sorry about the previous night, that he did not know what had gotten into him that caused him to do what he did, but did not state what he was sorry for. T. 455, 472. Crowley offered to pay for Vincent's copies. T. 455. Vincent again told Crowley that everything was fine. T. 455.

Later Sunday night, Carroll ran into Crowley. T. 456. Crowley asked her what was going on. T. 456. She told him that there was nothing she could do for him. T. 456. Crowley told Carroll that he "wouldn't normally do what [he had] done." T. 456. He said he could kill himself for what had happened. T. 456. Carroll told him that "drugs don't give you the excuse for you—what you did." T. 456, 943–44. Crowley told her he was just joking around, and asked if the police were involved. T. 457. Carroll told Crowley that the police were involved, and the conversation ended. T. 457.

Jennifer Bechtel testified that she was at Kings Point Park on Saturday, September 27, 1997, and drank four or five beers that night. T. 501, 503. She saw Francis Crowley at the park and engaged in small talk with him. T. 504. Crowley was with Bill Hardesy. T. 504. While she was talking with Crowley, he pulled a zip lock bag from his pocket and showed her some marijuana. T. 505. Crowley handed the bag to Hardesy. T. 505. Hardesy then put some marijuana in a pipe and smoked it. T. 505–06. Bechtel took two puffs of marijuana. T. 506. Crowley asked her if she wanted to go to a club and she said no. T. 506. She later left the park and re-

turned to campus. T. 507. Bechtel never saw Crowley smoke marijuana in her presence that night. T. 551–52.

Bechtel returned to her room and got ready for bed around 11:00 p.m. T. 509. Vincent was in the room at the time. T. 509. Bechtel testified that she normally locks the door to the room, and that she locked it that night before going to bed. T. 509–10. A half-hour after Bechtel went to bed, Vincent's friend Diane Bonnar knocked on the door. T. 510–11. Bechtel answered the door, and then left the room for a few minutes. T. 511. When Bechtel returned, Bonnar was gone and Vincent was in bed. T. 511. Bechtel went back to bed, but did not lock the door. T. 511.

Later that night, Bechtel heard the door open and saw Francis Crowley in the room. T. 512. Crowley went to Vincent's bed and asked for Bechtel. T. 513. She heard Vincent tell Crowley that Bechtel was in the other bed. T. 513. Crowley went over to Bechtel's bed and climbed up on her desk. T. 513. He said to Bechtel, "let's go party, let's smoke some crack." T. 513. She said no. T. 514. Crowley asked her numerous times to go out, but she said no each time. T. 514. Bechtel finally told Crowley that she had to get up early and to leave her alone. T. 515. She pulled the blanket up over her head and rolled over towards the wall. T. 515.

Bechtel then heard conversation between Vincent and Crowley. T. 517. She heard the door open and looked over to see Crowley and Vincent leaving the room. T. 517. She was not able to hear anything that occurred in the hallway. T. 517. Vincent was outside the room for "a while" before she returned. T. 518. Bechtel heard the door open again and looked over to see Crowley again enter the room. T. 519. She heard Vincent and Crowley speaking; Crowley was asking Vincent to go party and smoke crack. T. 519. The first time that Crowley asked Vincent to party and smoke crack with him, Bechtel heard Vincent say "no" with a laugh in her

voice. T. 541. Crowley made this request a few times, and Vincent refused each time. T. 519. Bechtel heard Vincent's bed creaking the entire time. T. 520.

At one point Bechtel heard Vincent say "no," and heard her tell Crowley that she had to study, and to leave. T. 520. Sometime later, Bechtel again heard the door open, and when she looked over she saw Valjato enter the room. T. 520. She heard Valjato climb up on Vincent's desk. T. 520. Bechtel heard Valjato ask Vincent a few times if he could go down on her. T. 521. She heard Vincent say "no" each time he asked. T. 521. Bechtel also heard Valjato tell Vincent that he had a tongue ring. T. 521. Valjato spoke in a normal speaking voice. T. 521. While Valjato was asking to go down on Vincent, Bechtel heard Crowley say, "come on, let him do it." T. 521. Although she could not hear everything, Bechtel heard Vincent say no a couple of times. T. 522. The bed was creaking loudly. T. 522. Valjato's voice got louder and he continued to ask Vincent to let him go down on her. T. 522. This conversation lasted quite some time. T. 523. Bechtel decided to stay in bed. T. 523.

Eventually, Bechtel heard Valjato loudly tell Vincent that she better not tell anybody or he would come and find her. T. 524. She then saw Crowley and Valjato leave the room. T. 524–25. However, Crowley entered the room a third time. T. 525. Bechtel heard the door open and looked over to see Crowley. T. 525. Valjato was not with him. T. 525. Bechtel heard Crowley tell Vincent that Valjato was really mad. T. 525. She could not hear much of what they were saying. T. 525. Shortly after he re-entered the room, Crowley left. T. 525. Bechtel did not hear Vincent crying or make any other remark to her at that time. T. 545.

Bechtel was not frightened by the fact that the defendants were in the room. T. 559. It never crossed her mind that anyone was "molesting [her] roommate in any frame, in any way, shape or form." T. 567.

Bechtel was annoyed by the fact that Crowley and Valjato were in the room for so long, T. 567, but was not alarmed by that fact. T. 568. Bechtel thought Vincent could take care of herself and did not think there was any reason to help. T. 576.

Bechtel went to sleep and awoke at 7:00 a.m. T. 526. Vincent was in the room, but they did not speak. T. 526. Bechtel returned to the room at 5:00 p.m. that day, and noticed that Vincent had been crying. T. 526. The two had a brief conversation about what had happened earlier that morning with Crowley. T. 526. Vincent asked Bechtel if she knew what happened. T. 546. Bechtel told her that two guys came into the room, they were annoying and she tried to sleep. T. 546. Vincent talked about pressing charges. T. 539. Bechtel testified that Vincent wanted to make sure that what Bechtel was saying about the incident was similar to what Vincent was saying. T. 539. Vincent did not say anything about Valjato during this conversation, but rather limited herself to discussing Crowley. T. 594.

Bechtel never heard Vincent yell out and ask her for help during the incident. T. 541. Bechtel testified that it is common for midshipmen to enter other midshipmen's rooms at night. T. 546. She also testified that it is a common occurrence for women at the Academy to be asked for sexual favors, and that she had been asked for sexual favors before. T. 546. Bechtel has a very poor personal opinion of Vincent and testified that Vincent was known at the Academy to make mountains out of mole hills. T. 570, 583–84. Bechtel testified that Vincent is not known as a truth teller. T. 584–85.

Diane Bonnar testified that she was friends with Vincent in September 1997 and that the two were volleyball teammates. T. 619–20. Bonnar accompanied Vincent and Carroll to Kings Point Park the evening of September 27, 1997. T. 621. Bonnar drank beer at the park and

became intoxicated. T. 622. Bonnar also saw Vincent drink one or two beers at the park. T. 622, 623. Vincent left the park before Bonnar. T. 627. When Bonnar returned to the Academy, she stopped by Palmer Hall to tell Vincent that she was back. T. 628. She knocked on Vincent's bedroom door and tried to open it, but it was locked. T. 629. Jennifer Bechtel answered the door. T. 629–30. Bonnar spoke briefly with Vincent and then returned to her dorm. T. 630–31.

The following morning, Bonnar, Vincent and Elizabeth Johnsen went to brunch. T. 631. Vincent did not mention anything about the incident during brunch. T. 646. The group later returned to Vincent's room, where Vincent told them about an incident earlier that morning involving Crowley and Valjato. T. 632. Vincent told Bonnar that Crowley came into her room, stood at her desk, leaned over her, and touched her and made threats to her, and told her to be quiet and not say anything. T. 632. Bonnar was told that Crowley had been pushing down the waistband of Vincent's shorts and reaching under her shirt. T. 634.

Vincent told her that Valjato later came into the room and stood on the desk with Crowley. T. 633. Bonnar testified that Vincent told her that after Valjato got on the desk with Crowley, she asked both of them to stop and then they "just stopped on their own." T. 633. Bonnar testified that Vincent did not relate to her anything at all about what Valjato may have said to Vincent during the incident. T. 633–34. During this forty-five minute conversation, Vincent appeared worried about her exams, stating that "she really didn't need this on top of exams." T. 637. Bonnar testified that Vincent said nothing about whether she was going to report the incident or not. T. 636. However, Vincent later called Bonnar on the phone and told her that she had told her mother, and her mother wanted Vincent to report the incident. T. 648. Vincent was trying to de-

cide whether to report it or not. T. 648, 652.

Jose Rodriguez was a midshipman at the Academy in September 1997. T. 656. He was close friends with Crowley. T. 658, 681. On Sunday, September 28, 1997, Crowley visited Rodriguez's room around three or four o'clock in the afternoon. T. 658. Crowley told Rodriguez that he had "hooked up with a Kings Point chick" the previous night. T. 659, 944. Rodriguez understood the term "hooked up" to mean to kiss, to make out. T. 659, 674. Crowley, at Rodriguez's request, told him it was Stephanie Vincent, and that the two had hit it off at the park. T. 659–60. Crowley and Rodriguez continued their conversation as they walked to Murphy Hall. T. 661. During their walk, Rodriguez spotted Vincent about a hundred feet away and waved to her. T. 661. Vincent waved back. T. 662.

The next day, Crowley returned to Rodriguez's room. T. 662. Crowley acted a little bit nervous, and told Rodriguez that Vincent was saying something about Crowley forcing himself on her. T. 663. Rodriguez asked him why she would say such a thing, and Crowley responded that he had "just felt her up." T. 663. Rodriguez had used this term before with Crowley, and understood this phrase to mean that Crowley had touched her breast or caressed her buttocks. T. 663. Crowley told him that Vincent had said "no, I can't do this. I have a boyfriend." T. 663.

One or two days later, Crowley again visited Rodriguez's room to tell him that Vincent was going to the police. T. 664. Crowley was pacing about the room, mumbling that he could not believe it happened and that he could not believe he had done something like that. T. 664. Crowley told Rodriguez that he did not know what had happened or why he did it, and asked Rodriguez if he should apologize. T. 664.

Later that week, Crowley again visited with Rodriguez. T. 666. By this time, Rodriguez had heard rumors on campus about what Vincent had been saying about

the incident. T. 666. Rodriguez told Crowley that he had heard something about Steven Valjato and Jennifer Bechtel. T. 666. Crowley told Rodriguez that Valjato was out in the hallway but that he was "so fucked up." [10] T. 666. Crowley had not mentioned Valjato in any of their prior conversations. T. 666.

Crowley admitted to Rodriguez that he had "fingered" Vincent, and that when she said no, he kissed her neck and touched her breast. T. 667. Crowley also told Rodriguez that he asked Vincent "can I go down on you and will you go down on me?" T. 667. During this time, Vincent was saying "no." T. 667–68. Crowley's demeanor was calm at the time of this conversation. T. 669. Rodriguez, who was the regimental human relations training officer at the Academy, later circulated a petition drive to keep Crowley in the Academy. T. 678, 684, 692, 694–95.

A couple of days later, Rodriguez saw Valjato on campus and spoke with him. T. 669–70. Rodriguez asked Valjato "what is the story of you being in the room?" T. 670. Valjato said, "I don't know anything about that. I was all fucked up." T. 670.

Elizabeth Johnsen testified that Vincent woke her up around 9:30 or 10:30 a.m. on Sunday, September 28, 1997. T. 715–16, 746–47. Vincent was visibly shaken up and had watery eyes. T. 716. Vincent described to Johnsen an incident involving Crowley and Valjato that had taken place earlier that morning. T. 716. Vincent told Johnsen that Valjato and Crowley had been looking for someone to party with and that they asked Vincent to go hang out with them and party. T. 717. Vincent said no and asked them to leave. T. 717. Crowley then got on Vincent's desk and told her that Valjato always had a crush on her and wanted to go down on her, and that she would like it. T. 717. Vincent told him no. T. 717. Crowley told Vincent that Valjato had a tongue ring and it

would feel good. T. 717. Again, Vincent told Johnsen, she said no and that she did not want anything to do with that. T. 717. One of them asked if they both could go down on her, and Vincent told them she had a boyfriend and he would not appreciate knowing about what they were asking her to do. T. 717. Vincent again "politely" asked them to leave. T. 717. Crowley then put his hand on her lower stomach area and her navel ring, and proceeded to put his hands down Vincent's pants. T. 718. Vincent tried to fight him off and kept asking them to leave, but the two became more physically aggressive and verbally aggressive. T. 718. Valjato then spoke up and said that they better go because they were not getting anywhere. T. 718. He said "there was no point, and just forget about it, let's get out of here and let's go party somewhere else." T. 718. As they were leaving, Vincent related to Johnsen, Crowley told Vincent that he better not hear about this incident again. T. 718. The two then left the room. T. 718. Vincent told Johnsen that "they" had drugs on them, but did not tell Johnsen specifically which defendant had what, if anything. T. 720. Vincent also told Johnsen that she was under the suspicion that Crowley and Valjato had been doing drugs that night. T. 740–41.

Bohuslav Humplik, Valjato's roommate and best friend, testified that he learned through the Academy "rumor mill" that Stephanie Vincent had made allegations about Valjato. T. 786. Humplik asked Valjato about the rumors, and Valjato told him that he, Crowley and Vincent had walked back from the park together that night and that Crowley and Valjato had walked Vincent to her room. T. 787. Valjato told Humplik that Vincent was drunk. T. 792. Humplik testified that on or about September 27, 1997, Vincent had gotten so drunk that she had fallen down and "bust[ed] her face." T. 793.

---

**10.** The jury was instructed that this testimony was not being admitted for the truth of the matter asserted, that is, it could not be used as proof that Valjato was, in fact, "fucked up." T. 666.

Linda Bulone testified that she received a telephone call from Vincent around 1:00 p.m. on September 28, 1997. T. 808. Vincent was very shaky and very hesitant and upset. T. 808. Vincent told Bulone about an incident involving Crowley and Valjato allegedly making unwanted sexual advances on her. T. 816. Bulone, formerly a medical administrator assistant at the Academy, helped Vincent get in touch with Captain Larson. T. 806, 820–21.

After the government completed its case in chief, the Court heard argument on the defendants' Rule 29 motions. The Court reserved decision. T. 862. Defendant Crowley then called four witnesses to the stand, each of whom testified to Vincent's poor character and reputation for truthfulness. 864–889. One of these witnesses, Matthew Delaney, lived in the room directly below that of Vincent and Bechtel in September 1997. T. 872. Delaney saw Francis Crowley on the stairway of the building at approximately 4:30 a.m. on Sunday, September 28, 1997, as Delaney was going to get a soda. T. 878, 873. He testified that from his room he usually could hear sounds from the sides, above or below. T. 874. He did not hear any indications of a struggle that morning or any calls for help. T. 874.

Following summations and the jury charge, the jury deliberated. T. 962–1071. During deliberations, the jury asked to hear a read back of the testimony of Jennifer Bechtel "pertaining to what she overheard between the hours of 4:51 and 6:12." Court Exhibit 3; T. 1123–24. Following the read back, the jury asked for clarification on the definition of the word "force," as discussed in element two of Count One. Court Exhibit 5; T. 1139. The Court, after consulting with counsel, decided to tell the jury that it had been provided the definition of "force," and that there would be no further instruction on this point. T. 1142. The jury was released to resume deliberations. T. 1142.

However, counsel for the defendants made an additional application for clarifica-

tion to the jury, which was opposed by the government. T. 1142–43. Approximately thirty minutes later, the Court again consulted with counsel and informed them of the Court's decision to provide an additional clarification on the meaning of "force." T. 1143. The Court heard additional argument, T. 1143–52, and then called the jury back into the courtroom and told them that the Court was preparing additional material with respect to "force," but that they nevertheless could continue their deliberations. T. 1152.

Following fifteen minutes of additional argument, T. 1153–57, the Court provided the jury with a clarified definition of the term "force." T. 1157–58. The jury left the courtroom at 4:24 p.m., and sent a note out one hour later indicating that they had reached a verdict. Court Exhibit 6. The jury returned a verdict of guilty on Counts One and Two, and not guilty on Counts Three and Four, as to both defendants. T. 1159–62.

### LEGAL STANDARDS

I. Fed.R.Crim.P. 29—Motion for Judgment of Acquittal

 In considering a motion for judgment of acquittal pursuant to Rule 29, the Court must view the evidence presented in the light most favorable to the government. *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir.1999) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). All permissible inferences must be drawn in favor of the government. *Id.* The Court must avoid usurping the role of the jury. *Id.* "[U]pon a motion for judgment of acquittal, 'the Court must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" *Id.* (internal quotation omitted). "[I]f the court 'concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court]

must let the jury decide the matter.'" *Id.* (quoting *Curley v. United States,* 160 F.2d 229, 233 (D.C.Cir.1947)).

## II. Fed.R.Crim.P. 33—Motion for a New Trial

■ "The burden of proving the need for a new trial lies with the defendant." *United States v. Sasso,* 59 F.3d 341, 350 (2d Cir.1995); *see also United States v. Ferguson,* 49 F.Supp.2d 321, 323 (S.D.N.Y. 1999) (citing *United States v. Soblen,* 203 F.Supp. 542 (S.D.N.Y.1961), *aff'd,* 301 F.2d 236 (2d Cir.1962)). The decision to grant or deny a motion for a new trial is firmly within the broad discretion of the trial judge. *Sasso,* 59 F.3d at 350; *see also Ferguson,* 49 F.Supp.2d at 323 (citing *United States v. Rodriguez,* 738 F.2d 13, 17 (1st Cir.1984)); *United States v. Zane,* 507 F.2d 346, 347 (2d Cir.1974) (reviewing trial court's denial of Rule 33 motion for abuse of discretion); *United States v. Madeoy,* 912 F.2d 1486, 1490 (D.C.Cir.1990) (decision to grant post-trial relief is within trial court's sound discretion). "[I]n deciding whether to grant a Rule 33 motion, a judge may weigh the evidence and determine the credibility of witnesses." *Ferguson,* 49 F.Supp.2d at 323 (citing *United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir.1992)). Moreover, on a Rule 33 motion, "[t]he Court is not required to view the evidence in the light most favorable to the Government." *Id.* (citing *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir.1980)). Nevertheless, the Court's discretion is limited to the extent that Rule 33 motions for a new trial are "not favored and should be granted only with great caution." *United States v. Gallego,* 191 F.3d 156, 161 (2d Cir.1999) (quoting *United States v. Stofsky,* 527 F.2d 237, 243 (2d Cir.1975) (quoting *United States v. Costello,* 255 F.2d 876, 879 (2d Cir.1958))).

## DISCUSSION

### I. Motions of Defendant Francis Crowley

#### A. Attacks on the Indictment

Crowley argues that the Court should set aside his convictions on Counts One and Two of the indictment, or alternatively order a new trial, because the Grand Jury clause of the Fifth Amendment was violated. Specifically, Crowley contends not only that these counts of the indictment failed to charge essential facts, but also that the government's proof, and the Court's instructions, constituted an impermissible constructive amendment of the indictment.

#### 1. Sufficiency of the Indictment

■ The issue presented is one of first impression. The question is whether an indictment alleging violation of 18 U.S.C. §§ 2241 and 2242 must set forth the specific facts alleged to constitute the proscribed sexual act in order to comply with the Fifth Amendment's Grand Jury clause. For the reasons discussed below, the Court holds that such factual particularity is required. As a result, the motion must be granted and the indictment dismissed.

The Fifth and Sixth Amendments set forth bedrock principles of constitutional law: "No person shall be held to answer for a capital or otherwise infamous crime, unless on a prosecution or indictment of a grand jury," U.S. Const. amend. V., and "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. These principles are enshrined in Fed.R.Crim.P. 7(c), which states that "[t]he indictment ... shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." The Second Circuit has held that fidelity to this rule is required in order to safeguard a defendant's constitutional rights. Compliance with Rule 7(c) fulfills the Sixth Amendment right to be informed of the nature and cause of the accusation; it prevents a person from being subject to double jeopardy as required by the Fifth Amendment; and it serves the Fifth Amendment protection

**154**

against prosecution for crimes based on evidence not presented to the grand jury.

*United States v. Walsh,* 194 F.3d 37, 44 (2d Cir.1999) (quotation marks omitted); *see also United States v. Silverman,* 430 F.2d 106, 110 (2d Cir.1970) (analyzing sufficiency of the indictment to "insure that the defendant [was] not tried upon a theory or evidence which was not fairly embraced in the facts upon which the grand jury based its charges"), *modified,* 439 F.2d 1198 (2d Cir.1970).

Crowley argues that the indictment handed down by the grand jury fails to satisfy the Fifth Amendment requirement explained in *Walsh* and *Silverman* because the indictment was silent as to which of the four sexual acts set forth in the statute the defendant was alleged to have attempted to commit. *See* 18 U.S.C. § 2246(2). Thus, according to Crowley, there is a substantial danger that he was convicted on evidence of alleged sexual acts that was not presented to the grand jury. Crowley contends that the failure to allege the specific unlawful conduct proscribed by the statute is fatal because there is no way to determine what conduct the grand jury chose to allege as criminal.[11]

■■ The government responds that this argument has been waived for Crowley's failure to raise it before trial. This argument is without merit. Rule 12 of the Federal Rules of Criminal Procedure requires that "[a]ny defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion." Fed. R.Crim.P. 12(b). This rule further requires that any objection based on a supposed defect in the institution of the prosecution, or any objection based on alleged defects in the indictment, must be raised prior to trial. Fed.R.Crim.P. 12(b)(1–2). Rule 12 declares that a party's failure to raises objections that must be made prior to trial "shall constitute waiver thereof," although the Court, for good cause shown, may grant relief from the waiver. Fed. R.Crim.P. 12(f).

By Notice of Motion dated April 14, 1999, defendant Valjato presented an omnibus motion seeking, inter alia, a ruling pursuant to Fed.R.Crim.P. 12 to dismiss the indictment as vague, or in the alternative, an order directing the government to amend the existing indictment so that it conformed with Fed.R.Crim.P. 7(c). By Notice of Motion dated April 12, 1999, Crowley moved, inter alia, for an order "[a]llowing Mr. Crowley to join in the motions of his co-defendant ... to the extent that the same apply to him." Given that both defendants were charged under the same indictment, it is clear that Valjato's motion to dismiss the indictment also applied to Crowley.[12] Thus, there was no waiver of this issue by the defendants. *See United States v. Berlin,* 472 F.2d 1002, 1007 (2d Cir.1973) (holding that appellant's failure to raise insufficiency of indictment

---

**11.** As Crowley puts it, his "argument is simple: the Indictment is silent on the essential question of what he in fact was being said to have done, and thus no one knows what the grand jury in fact thought he did." In other words, "what on earth did our grand jury mean when it charged a 'sexual act'? ... There is simply no way we can be sure what the grand jury meant by a 'sexual act' when its Indictment is silent on the question." Defendant Crowley's Reply Memorandum of Law, at 6, 7, 8. Crowley makes no claim that the Sixth Amendment's notice requirement was not met, and emphasized this point repeatedly at oral argument. *Id.* at 5–6; Transcript of Oral Argument, October 29, 1999 ("I think it is important to make sure this isn't a

question of adequacy to notice to the defendant so he could prepare for trial. The vice that is involved here is the failure to comply with the Fifth Amendment requirement that a felony prosecution be based on a grand jury indictment.").

**12.** The government's opposition to the defendants' pre-trial motions indicates that the prosecution clearly understood this motion to be an attack on the sufficiency of the indictment. *See* Government's Memorandum of Law in Opposition to Defendants' Pretrial Motions, at 40–41 (citing *United States v. Citron,* 783 F.2d 307 (2d Cir.1986) (discussing sufficiency of the indictment)).

until after completion of government's case did not constitute a waiver). In any event, if this challenge had in fact been waived, the Court nevertheless would grant relief from the waiver, prejudice and good cause having been shown. *See* Fed.R.Crim.P. 12(f); *United States v. Forrester*, 60 F.3d 52, 59 (2d Cir.1995) (decision to grant relief from waiver firmly within trial court's discretion); *United States v. Freeling*, 31 F.R.D. 540, 543 (S.D.N.Y.1962) (same); *see also United States v. Sutton*, 961 F.2d 476, 478–79 (4th Cir.1992) (defendant may challenge sufficiency of indictment at any time in the proceedings); *United States v. Rodriguez*, 556 F.2d 638, 641 (2d Cir.1977) (holding that appellate review of sufficiency of the indictment claim was barred by defendant's failure to raise issue in district court).

 The government further argues that the Court is required by the law of the case doctrine to fully adhere to its prior decision on this issue. This argument also fails.

The Court ruled on the defendants' motion to dismiss the indictment at a pre-trial conference held on June 10, 1999. Specifically, the Court stated:

> The fourth motion that you bring is to dismiss under Federal Rules of Criminal Procedure, Rule 7(c)(1), and that the basis for that is the indictment is vague, or in the alternative with this motion you move to weigh [sic] the government to amend, to reflect the specific facts of what happened on the night in question, as you request in your memorandum of law at page 16. Rule 7(c) requires that the indictment quote, shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. The law in this circuit permits an indictment essentially to track the statutory language of the—and simply requires that the elements of the crime be stated. And the government cites, and I concur in that, United States v. Citrone [sic] at 783 F.2d 307. This indictment meets those requirements.

Clearly the indictment informs the defendant of the offense he's charged with so that he can make a proper defense to these charges. It advises him of the date, place and acts that he's alleged to have committed. So this motion is also denied.

Transcript of Conference, June 10, 1999, at 6–7. At the time of its ruling, however, the Court was unaware of the true nature of the evidence that was to be presented by the government and the significant tension between the proof as it was to be presented at trial and the allegation of a singular "sexual act" as charged in the indictment. The Court also failed to consider the full nature of the Fifth Amendment rights that were at issue, particularly on the question whether the defendants were about to be tried on evidence that had not been presented to the grand jury. *Compare Walsh*, 194 F.3d at 44 (outlining three constitutionally required functions of Fed.R.Crim.P. 7(c)).

Therefore, although the Court previously ruled on the sufficiency of the indictment, and as a general proposition would be required to adhere to this ruling in a subsequent stage of the proceedings, the Court finds that to prevent manifest injustice, there are compelling reasons to reconsider and depart from its prior holding. *See Arizona v. California*, 460 U.S. 605, 618 & n. 8, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) ("it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice."); *Sanders v. Sullivan*, 900 F.2d 601, 605 (2d Cir.1990) (court may depart from a prior ruling for "cogent" or "compelling" reasons). The Court therefore proceeds to determine whether the indictment was insufficient as a matter of law because of its alleged failure to specify the precise nature of the sexual act charged.

In this regard, the government asserts that the indictment is sufficient because it clearly sets forth each element of the charged offense and closely tracks the lan-

guage of the statute. *See Walsh*, 194 F.3d at 44 ("we have consistently upheld indictments that 'do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'") (quoting *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir.1975));[13] *compare United States v. Aliperti*, 867 F.Supp. 142, 144 (E.D.N.Y. 1994) ("an indictment need only be supplemented when the statute itself contains generic terms."); *with United States v. Washington*, 106 F.3d 983, 1012 & n. 43 (D.C.Cir.1997) (requiring that the indictment state concisely the essential facts constituting the offense); *see also United States v. Sullivan*, 919 F.2d 1403, 1422 (10th Cir.1990) (holding that where statute employs generic terms the indictment must employ specifics, leaving no room for uncertainty or ambiguity); 1 Wright, Federal Practice and Procedure § 125 (1982) ("The acts and intent that make up the crime should be set forth in the indictment or information with reasonable particularity of time, place, and circumstances.").

The government denies that the indictment is required to state the specific facts underlying the charged element. *See Citron*, 783 F.2d at 314–15 (affirming sufficiency of indictment in tax evasion case where indictment failed to specify precise amounts of taxes the defendant sought to evade). Rather, the government claims that because the indictment charges the essential elements of the offense, including a "sexual act," the defendants were not tried on conduct which the grand jury had not considered.

The exact language of Counts One and Two of the indictment is reproduced in footnotes one and two, *supra*. Briefly, both counts charged the defendants with an "attempt to cause another person to engage in a sexual act." The first count alleged that the defendants' actions were taken "by using force," while the second count alleged that the actions were taken "by threatening and placing that other person in fear."

Section 2246 of Title 18 of the United States Code contains four precise and concrete definitions of the term "sexual act," each of which is easily distinguishable from the others. The term means

(A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight;

(B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;

(C) the penetration, however slight, or the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or

(D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

18 U.S.C. § 2246(2). As is clear from the statutory language, each subparagraph is unique. Two definitions of the term "sexual act," subparagraphs (C) and (D), contain an additional, specific mens rea requirement. Only subparagraph (D) contains a requirement that the victim be under the age of 16. Subparagraph (A) further subdivides the term into two types of sex, vaginal or anal. Finally, the definition in subparagraph (B) is that of oral sex, while

---

**13.** The Court observes that the language in both *Walsh* and *Tramunti* is in remarkable tension with the Supreme Court's statements in *Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), that where essential specific facts are at issue—which facts may or may not have been presented to the grand jury—"an indictment must do more than simply repeat the language of the criminal statute," but rather "must descend to particulars," and that an indictment can be defective "although it may follow the language of the statute." *Russell,* 369 U.S. at 764–65, 82 S.Ct. 1038.

subparagraph (C) deals with manual or "object" penetration.

There was no evidence presented at trial, nor any claim made by the government, that subparagraphs (A) or (D) were relevant to this case.[14] However, there was considerable evidence that Crowley (1) had attempted to insert his finger into Vincent's vagina and (2) had attempted to convince Vincent to allow him to use his mouth to engage in contact with Vincent's vulva. As is clear from the statute, the first factual scenario would constitute an attempted sexual act as defined in subparagraph (C), while the second factual scenario implicates only subparagraph (B). Importantly, unlike subparagraph (B), the definition of "sexual act" contained in subparagraph (C) contains its own unique intent requirement, that is, that the act be performed with "an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(2)(C). Finally, although the indictment charged the defendants with an attempt to cause another to engage in a singular sexual "act," at trial the government proceeded on a theory that plural sexual acts were attempted, and evidence was introduced on both factual scenarios. *See* T. 108–10, 964–66, 976–77, 983, 985, 1055, 1065.

"The Indictment Clause of the Fifth Amendment 'requires that an indictment contain *some amount of factual particularity* to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury.'" *Walsh*, 194 F.3d at 44 (emphasis added) (quoting *United States v. Abrams*, 539 F.Supp. 378, 384 (S.D.N.Y. 1982)). This factual specificity is required in order to ensure that a conviction is not secured "on the basis of facts not found by, and perhaps not even presented to, the

grand jury" that voted for the indictment. *Russell*, 369 U.S. at 770, 82 S.Ct. 1038.

In *Russell*, the leading case on indictment sufficiency, the Supreme Court struck an indictment where a defendant had been charged with unlawfully refusing to answer certain questions before a congressional committee. *Russell*, 369 U.S. at 752, 82 S.Ct. 1038. The statute at issue made it a crime for any person to "refuse[ ] to answer any question pertinent to the question under inquiry" by Congress. *Id.* at 752 & n. 2, 82 S.Ct. 1038 (citing 2 U.S.C. § 192). The indictment was silent as to the subject matter of the congressional inquiry at the time the defendant was interrogated. *Id.* at 752, 82 S.Ct. 1038. Instead, the indictment merely tracked the language of the statute, and contained only a conclusory statement that the questions to which answers were refused "were pertinent to the question then under inquiry." *Id.* The Court, noting that minor and/or technical deficiencies in an indictment do not require dismissal unless the omission actually prejudiced the defendant, pointed out that "[w]here guilt depends so crucially on such a specific identification of fact, . . . an indictment must do more than simply repeat the language of the criminal statute." *Id.* at 764, 82 S.Ct. 1038.

The *Russell* Court framed the question as whether the indictment's omission of the subject under congressional committee inquiry deprived the defendant "of one of the significant protections which the guaranty of a grand jury indictment was intended to confer." *Id.* at 763, 82 S.Ct. 1038. To answer this inquiry, the Court reviewed its prior treatment of criminal pleadings.

The Court recognized that "[i]t is an elementary principle of criminal pleading, that where the definition of an offence, whether it be at common law or by statute,

---

**14.** Despite the irrelevancy of subparagraph (A), the Court nevertheless charged the jury on the language contained therein. *See* T. 1097. However, the defendants did not object to the inclusion of this definition of a "sexual act," and any resulting error was harmless.

includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species—, it must descend to particulars." *Id.* at 765, 82 S.Ct. 1038 (quoting *United States v. Cruikshank,* 92 U.S. 542, 558, 23 L.Ed. 588 (1875)). Moreover, "[a]n indictment not framed to apprise the defendant with reasonable certainty, of the nature of the accusation against him ... is defective, although it may follow the language of the statute." *Id.* (quoting *United States v. Simmons,* 96 U.S. 360, 362, 24 L.Ed. 819 (1877)) (ellipses in original). Where, as here, the indictment is statutorily based, "it is not sufficient to set forth the offence in the words of the statute, unless those words themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." *Id.* (quoting *United States v. Carll,* 105 U.S. 611, 612, 26 L.Ed. 1135 (1881)).

Finally, although the general language of a statute may be used in the indictment, "it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Id.* (quoting *United States v. Hess,* 124 U.S. 483, 487, 8 S.Ct. 571, 31 L.Ed. 516 (1888)). Otherwise, the defendant must go to trial with the "chief issue undefined." *Id.* at 766, 82 S.Ct. 1038; *see also United States v. Lamont,* 236 F.2d 312, 317 (2d Cir.1956) (criminal pleading "should avoid ... a formalism of generality"). Lack of specificity in an indictment further "enables [a defendant's] conviction to rest on one point and the affirmance of the conviction to rest on another. It gives the prosecution free hand on appeal to fill in the gaps of proof with conjecture and surmise." *Russell,* 369 U.S. at 766, 82 S.Ct. 1038.

The *Russell* Court ultimately held that the omission from the indictment of the facts constituting the "core of criminality"

of the statute was both prejudicial and violative of the defendant's constitutional rights. The Court reasoned that "[t]o allow the prosecutor, or the Court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure." *Id.*

The Supreme Court later clarified this holding in *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). The *Hamling* Court reviewed a challenge to an indictment charging the defendants with violation of 18 U.S.C. § 1461, which, inter alia, bars the mailing of obscene materials. The defendants argued that the indictment was insufficient because it merely tracked the language of the statute and because it failed to place them on notice of the charges against them. *Hamling,* 418 U.S. at 117, 94 S.Ct. 2887.

The Supreme Court rejected the defendants' reliance on *Russell.* The Court began its analysis of this challenge by quoting *Russell*'s critical language:

> [T]he very core of criminality under 2 U.S.C. § 192 is pertinency to the subject under inquiry of the questions which the defendant refused to answer. What the subject actually was, therefore, is central to every prosecution under the statute. Where guilt depends so crucially upon such *a specific identification of fact,* our cases uniformly have held that an indictment must do more than simply repeat the language of the criminal statute.

*Hamling,* 418 U.S. at 118, 94 S.Ct. 2887 (emphasis and brackets in original) (internal citation omitted). The Court then distinguished its prior holding by explaining that unlike the crime alleged in *Russell,* which depended on the identification of the subject of congressional inquiry, the definition of "obscenity" in the instant indictment was "not a question of fact, but one of law; the word 'obscene' as used in [the

statute] is not merely a generic or descriptive term, but a legal term of art." *Id.* (citing cases). The Court noted that "[t]he legal definition of obscenity does not change with each indictment; it is a term sufficiently definite in legal meaning to give a defendant notice of the charge against him." *Id.* at 118–119, 94 S.Ct. 2887 (citing cases). The Court held that the indictment therefore was sufficient, and did not need to allege the "various component parts of the constitutional definition of obscenity." *Id.* at 119, 94 S.Ct. 2887.

Here, there is no doubt that a "sexual act" is the most essential element of the crimes of aggravated sexual abuse and sexual abuse under 18 U.S.C. §§ 2241 and 2242. Indeed, without a sexual act or an attempted sexual act, there is no crime under these two sections of the statute. The "core of criminality" under these sections is a "sexual act," of which there are four separate and distinct types. *See* 18 U.S.C. § 2246(2). The term "sexual act" is an umbrella phrase, its panels protecting against at least four different species of unlawful acts. It is a generic [15] term that can change dramatically with each indictment. *See Hamling,* 418 U.S. at 118–19, 94 S.Ct. 2887.

Moreover, the issue of what constitutes a "sexual act" is a question of fact, not of law. The term "sexual act"—unlike the term "obscenity"—is not a legal term of art, but rather is a generic term. *See Hamling,* 418 U.S. at 118, 94 S.Ct. 2887. Many different acts, taken with variable gradations of intent, can constitute a "sexual act." Thus, the precise identification of the specific actions alleged to constitute the charged "sexual act" is vital to a determination of a defendant's guilt. *See Russell,* 369 U.S. at 764, 82 S.Ct. 1038.

The determination whether a "sexual act" was committed or attempted is central to every prosecution under these statutes.

Congress intended to punish those who cause or attempt to cause another person to engage in a sexual act by force, fear, or threats; or to engage in a sexual act with a minor; or with a person unable to evaluate the nature of the conduct or physically incapable of declining participation in a sexual act. *See* 18 U.S.C. §§ 2241–2244; *see generally* H.R.Rep. No. 99–594 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6186 (discussing reasons for modernizing federal rape statute).

Moreover, the failure of the indictment to specify the actions alleged to violate the statute is not a mere technical error, such as an erroneous or omitted citation to a date, place, time, or even the statute itself. *See* Fed.R.Crim.P. 7(c)(3). Rather, the fundamental prohibition of the statute is causing another to engage in a "sexual act" through unlawful means or with a person lacking capacity to consent or dissent. Given the variety of ways in which this statute could be violated, the conduct alleged to comprise the charged "sexual act" must be delineated in the indictment. *See* 1 Wright, Federal Practice and Procedure § 125 (1982) ("If the statute charges a variety of possible offenses, a pleading in the statutory language that does not indicate which offenses defendants are alleged to have committed is insufficient, and if the statute is couched in general terms, the indictment must particularize the offense.").

The government claimed at oral argument that "the case was about oral sex, ... that was the case. The bulk of the evidence was the oral sex." Transcript of Oral Argument, October 29, 1999. However, this representation does not lessen the impact of the introduction of a significant amount of testimony, and substantial argument by the government, that Crowley had touched, groped, and gripped Vincent's vagina, and had attempted to insert his finger into her genital opening. T. 108–10,

---

**15.** "Generic" means "relating to or characteristic of a whole group or class; general, as opposed to specific." Black's Law Dictionary 686 (6th Ed.1990); *see also* Webster's Ninth New Collegiate Dictionary 510 (1988) (same).

964–66, 976–77, 983, 985, 1055, 1065. Nor does this argument increase the likelihood that the facts alleged to constitute the offenses were presented to the grand jury. Taking at face value the government's representation that this case was all about oral sex, which certainly was not the government's position at trial, there can be no doubt that the admission of evidence of Crowley's attempted digital penetration was prejudicial. The prejudice is magnified by the alleged deficiencies in the indictment.

The government concedes that an indictment must inform a defendant of the "core of criminality" of the alleged offense, but argues that the defendants here were aware of the "core of criminality" of the alleged offenses.[16] Government's Memorandum of Law in Opposition to Motions, at 6, 9, 10. The phrase "core of criminality" was used by the Supreme Court in *Russell* in discussing the necessity of identifying specific allegations of fact in the indictment. *Russell*, 369 U.S. at 764, 82 S.Ct. 1038; *see also Citron*, 783 F.2d at 315 (pointing out that the indictment in *Russell* was problematic because it omitted the factual basis for an essential element of the offense). The government asserts that because the indictment charged the essential elements of the crimes, the defendant was not tried on charges upon which a grand jury had not passed. *Id.* at 7 (citing *United States v. Wydermyer*, 51 F.3d 319, 325 (2d Cir.1995)). However, aside from being conclusory and overly simplistic, this argument fails to address the central thesis of Crowley's argument: that nobody can say whether he was convicted of attempted oral sex or attempted digital penetration, and, whichever one it was, or both, nobody can say whether the grand jury ever considered the facts underlying both alleged sexual acts, or either one of the· two, prior to returning the indictment.

When asked point-blank at oral argument exactly which sexual act Crowley was convicted of, the government struggled to answer. Eventually the government conceded that nobody could answer that question. Transcript of Oral Argument, October 29, 1999. The reason that the question cannot be answered is because the indictment apparently and impermissibly lumped together two distinct sexual acts under the singular phrase "sexual act," proof of both factual scenarios was presented at trial, and the Court charged the jury on both. Compounding the error is that with regard to the alleged attempted digital insertion, Section 2246(2)(C) contains an additional mens rea requirement, that is, that the penetration of the genital or anal opening by a finger be performed "with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(2)(C). This additional mens rea requirement was not set forth in the indictment, nor was the jury separately and specifically charged on this heightened requirement for the "sexual act" defined in Section 2246(2)(C).

One case profoundly demonstrates the need for factual specificity in an indictment under these statutes. In *United States v. Downer*, 143 F.3d 819, 820 (4th Cir.1998), the defendant was indicted for aggravated sexual abuse of his stepdaughter, a ten year-old girl, in violation of 18 U.S.C. § 2241(c). The indictment contained three counts, each of which alleged a different type of sexual act as defined in 18 U.S.C. § 2246. *Downer*, 143 F.3d at 820. The first count alleged contact between the penis and the vulva, which is the "sexual act" defined in 18 U.S.C. § 2246(2)(A). *Id.* The second count alleged contact between the penis and the anus, a "sexual act" also defined in § 2246(2)(A). *Id.* The third count alleged "intentional touching, 'not

---

**16.** This argument misses the mark. Crowley specifically is not claiming that the notice requirement of the Sixth Amendment was violated, but rather that the Fifth Amendment's

Grand Jury clause was violated. *See* Defendant Crowley's Memorandum of Law in Support of Post–Trial Motions, at 4 & n. 4.

through the clothing,' of the genitalia of another person who had not yet attained the age of 12 years 'with an intent to abuse, humiliate, harass, degrade, and arouse and gratify the sexual desire of any person,' " a "sexual act" which is defined in § 2246(2)(D). *Id.* (quoting language of the indictment). In other words, although the defendant was charged only with aggravated sexual abuse, each count of the indictment distinguished between the three unique "sexual acts" the defendant was accused of committing.

During deliberations, the jury twice returned to the courtroom to indicate that the jurors were deadlocked. *Id.* The judge twice read an *Allen* charge. *Id.* Finally, the jury informed the court that it had reached a unanimous verdict on two counts, but could not agree on a third. *Id.* The jury then returned a verdict convicting the defendant on count three, but acquitting the defendant on count two. *Id.* The jury could not reach a verdict on count one. *Id.*

The *Downer* indictment's explicit recognition of the many different types of actions that can constitute a prohibited "sexual act" demonstrates the relative ease with which an indictment may accurately and constitutionally be drafted. Moreover, the *Downer* jury's mixed verdict demonstrates the danger a defendant may face if he or she goes to trial with the "chief issue undefined." *See Russell*, 369 U.S. at 766. That danger is the peril faced here by Crowley and Valjato: that they may have been convicted based on evidence that was never presented to the grand jury.

In sum, as the Second Circuit proclaimed in *Walsh*, an indictment must "contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *Walsh*, 194 F.3d at 44 (quotation marks omitted). This Court cannot say with any degree of certainty that the defendants' convictions were obtained by the use of evidence that first was presented to

the grand jury. This lack of certainty stems from a comparison of what is charged in the indictment—a singular generic sexual act—and the proof presented at trial of two distinct types of sexual acts. Under these circumstances, the Court cannot be certain that the government did not impermissibly "fill in elements of its case" with facts not presented to the grand jury. *Walsh*, 194 F.3d at 44. Therefore, Crowley's motion must be granted on the ground that the indictment was insufficient for its failure to specify the essential facts of the offenses found in Counts One and Two. *See Russell*, 369 U.S. at 765, 82 S.Ct. 1038 ("it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition"); *see also Aliperti*, 867 F.Supp. at 144 (indictment must be supplemented when statute itself contains generic terms).

The Court takes no position on any potential defenses that may be raised by the defendants as a bar to reprosecution should the government elect to again present the case to a grand jury. *United States v. Wozniak*, 126 F.3d 105, 111 (2d Cir.1997) (expressing no view about government's ability to reprosecute after appellate court's reversal of conviction because of a constructive amendment of indictment); 18 U.S.C. § 3731 (permitting government to appeal dismissal of an indictment or the grant of a new trial except where Double Jeopardy clause prohibits further prosecution); *but see Downer*, 143 F.3d at 823 (double jeopardy clause does not prevent retrial after reversal based on defective indictment as opposed to insufficiency of the evidence) (citing *United States v. Akpi*, 26 F.3d 24, 26 (4th Cir.1994)); *see also United States v. Cabrera–Teran*, 168 F.3d 141, 147 (5th Cir.1999) (same); *United States v. Pedigo*, 12 F.3d 618, 631–32 (7th Cir.1993) (same).

### 2. *Constructive Amendment of Indictment*

In light of the Court's holding that the indictment was insufficient, the Court need

not address Crowley's argument that there was an impermissible constructive amendment of the indictment. The Court notes, however, that many of the issues raised by Crowley in this argument are identical to those raised and discussed previously. That is, the government elicited evidence at trial that defendant Crowley had rubbed Vincent's breasts repeatedly, groped or grabbed her vagina, attempted to insert his finger into her vagina, and persistently but unsuccessfully had requested that Vincent allow him to perform oral sex on her.

Without knowing, however, whether the grand jury indicted Crowley for attempted digital penetration or attempted oral sex, the Court cannot determine whether the indictment impermissibly was constructively amended at trial. What is clear, however, is that the indictment charged only one "sexual act," and the jury was instructed that it could find the defendants guilty of one or more sexual "acts." *See Stirone v. United States*, 361 U.S. 212, 216–19, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) (reversing conviction where indictment charged one type of interference with interstate commerce but proof of two types of such interference was introduced at trial and jury was instructed that a conviction could rest on either type); *United States v. Frank*, 156 F.3d 332, 337 (2d Cir.1998) ("[t]o prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment"); *United States v. Mucciante*, 21 F.3d 1228, 1233 (2d Cir. 1994) (where court finds "that the indictment has been constructively amended, there is a *per se* violation of the Grand Jury Clause and the conviction on the amended counts must be reversed").

### B. Failure to Require Specific Unanimity

■ Crowley also argues that a new trial should be ordered because he was deprived of his right to a unanimous jury verdict on Counts One and Two. Crowley contends that because the jury could have convicted him on either the attempted digital penetration allegation or the attempted oral sex allegation, the Court should have required that the jury complete a special verdict form indicating that the jury's verdict was unanimous as to which "sexual act" it believed had been attempted. This argument is without merit.

■ The Second Circuit has held that a "jury must reach a unanimous verdict as to the factual basis for a conviction." *United States v. Schiff*, 801 F.2d 108, 114 (2d Cir.1986). However, "a general charge regarding unanimity is ordinarily sufficient to protect the defendant's right to a unanimous verdict." *United States v. Harris*, 8 F.3d 943, 945 (2d Cir.1993) (citing *Schiff*, 801 F.2d at 114–15). The court of appeals has pointed out that "[w]hile a specific charge regarding unanimity of the factual basis for the verdict may be given, it is not error to refuse to give such a charge." *Harris*, 8 F.3d at 945 (citing *Schiff*, 801 F.2d at 115).

In its discussion of the holding in *Schiff*, the *Harris* court evaluated the decision of the Supreme Court in *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). In *Griffin*, the Supreme Court reviewed the conviction of a defendant who had been charged with a conspiracy with two alleged objects, one involving the I.R.S. and the other involving the Drug Enforcement Administration ("D.E.A."). However, the government was unable to adduce evidence at trial that connected the defendant with the object of the conspiracy as it related to the D.E.A. Although Griffin's counsel requested that the district court instruct the jury that she could be found guilty of conspiracy only if she was aware of the I.R.S. object of the conspiracy, the court denied that request. Instead, the court instructed the jury in such a way that the defendant could have been convicted if the jury believed she was guilty of *either* the I.R.S. object of the

conspiracy or the D.E.A. object of the conspiracy.

On review, the Supreme Court affirmed the conviction. The Second Circuit's interpretation of that affirmance was that "while a conviction would have to be reversed if a general verdict of guilty came in where one of the grounds was unconstitutional or legally barred (as in the running of the statute of limitations, for instance), the general guilty verdict would stand where the only claim was that one of the grounds was supported by insufficient evidence." *Harris*, 8 F.3d at 946. In the Supreme Court's words, "if the evidence is insufficient to support an alternative legal theory of liability, it would generally be preferable for the court to give an instruction removing that theory from the jury's consideration. The refusal to do so, however, does not provide an independent basis for reversing an otherwise valid conviction." *Griffin*, 502 U.S. at 60, 112 S.Ct. 466 (emphasis added).

In this case, the Court's failure to give a specific unanimity instruction, especially where defense counsel failed to object to that instruction, was not erroneous. T. 947–49. Assuming for the sake of this argument that the indictment was sufficient, *see* Part I.A., *supra*, the evidence adduced at trial was sufficient to convict defendant Crowley on either the attempted digital penetration or on the persistent requests of oral sex. *See Jackson*, 443 U.S. at 319, 99 S.Ct. 2781 (sufficiency of evidence determined by viewing evidence presented in light most favorable to the government). The Court's general unanimity instruction was sufficient to protect the defendant's right to a unanimous verdict, and the motion cannot be granted on this ground.

### C. Failure to Charge Voluntary Intoxication

Defendant Crowley requested that the Court charge the jury on voluntary intoxi-

cation.[17] The requested instruction, patterned in large·part after Sands' Federal Jury Instruction 8–3, was as follows:

There has been evidence that the Defendant may have been intoxicated at the time of the offense [with] which he [is] charged. Intoxication or drunkenness in itself is not a legal defense to a criminal charge. However, intoxication or drunkenness may negate the existence of the defendant[']s intent to commit the crime that the government must prove in order to convict.

On the evidence before you, if you find that the defendant was intoxicated, you may conclude that the defendant did not have the required intent I described earlier. On the other hand, if you believe that the defendant was intoxicated to some degree, you still may conclude that he was capable of having the required intent. After considering all of the evidence, if you find that the government has established [each of the elements] beyond the [sic] reasonable doubt, then you may find the defendant guilty. On the other hand, if you find that the government has failed to meet this burden beyond a reasonable doubt, you must find the defendant not guilty. I charge you as a matter of law voluntary intoxication is a defense to Count One and Count Two of the Indictment, (Specific Intent Crimes permit voluntary intoxication as a defense.) (See *United States v. Sneezer*, 983 F.2d 920, 922–23 (9th Cir.1992)).

Crowley's Request for Instructions, July 9, 1999, at 4. Defendant Valjato joined Crowley's application for a voluntary intoxication charge. T. 938.

The Court heard argument from both sides regarding this request to charge voluntary intoxication on the evening of July

---

**17.** The requested instruction mistakenly was written by counsel as a request for an "Involuntary Intoxication Instruction." *See* Defendant Crowley's Request for Instructions, dated July 9, 1999, at 4.

13, 1999 and again the following morning. The July 13 conversation between counsel and the Court was as follows:

> COURT: Mr. Kase is correct with respect to the attempt counts involved in this matter, that they are specific intent crimes. However, before we get to that level there must be evidence of intoxication. And I will review the record, especially Ms. Bechtel's testimony, because it appears to me to my recollection that other than statements that Ms. Bechtel supposedly made to other people—
>
> MR. KASE: Ms. Vincent.
>
> COURT: I am sorry, Ms. Vincent. I will correct that to Ms. Vincent. That Ms. Vincent made to other people that were testified to by the other people, there doesn't appear to be any evidence of intoxication. Other than Mr. Crowley was acting hyper, and Mr. Valjato was lethargic. That to me is not evidence of intoxication. Intoxication is blurry eyes, alcohol on the breath, inability to stand or move, something demonstrative of the person exhibiting signs of intoxication, be it by drugs or alcohol. So, I will take another look at Ms. Vincent's testimony if that has been brought out. I don't see it with respect to other witnesses. Their reference points is with respect to what they heard Ms. Vincent say, and that would be as to whether the defendants were intoxicated.

T. 926.

The following morning, the Court issued its ruling regarding this request, and denied the defendants' requests to charge the jury on voluntary intoxication. T. 937–39. The Court held that the evidence to which its attention had been directed by the defendants, at pages 294, 84, 111, 302–03, and 102, was "not sufficient to warrant the intoxication defense." T. 939.

■■■■■■ Under the law of the Second Circuit, "[a] criminal defendant 'is entitled to have instructions presented relating to any theory of defense for which there is *any* foundation in the evidence, no matter how weak or incredible that evidence may be.'" *United States v. Diaz*, 176 F.3d 52, 98 (2d Cir.) (emphasis added) (quoting *United States v. LaMorte*, 950 F.2d 80, 84 (2d Cir.1991)), *cert. denied*, 120 S.Ct. 181 (1999). Put another way, the court of appeals "has 'repeatedly recognized a criminal defendant's right to a charge which reflects the defense theory.'" *United States v. Evangelista*, 122 F.3d 112, 116 (2d Cir.1997) (quoting *United States v. Durham*, 825 F.2d 716, 718 (2d Cir.1987)). "This rule holds as to any theory 'for which there is some foundation in the proof, no matter how tenuous that defense may appear to the trial court.'" *Evangelista*, 122 F.3d at 116 (quoting *United States v. Vazquez*, 113 F.3d 383, 386 (2d Cir.1997)). Assuming that the defense theory has a basis in law and some support in the evidence, criminal defendants "are entitled" to an instruction on their defense. *Evangelista*, 122 F.3d at 116.

■■■■■■ "Whether jury instructions were properly given is a question of law." *United States v. Salameh*, 152 F.3d 88, 142 (2d Cir.1998) (quoting *United States v. Dove*, 916 F.2d 41, 45 (2d Cir.1990)), *cert. denied*, —— U.S. ——, 119 S.Ct. 885, 142 L.Ed.2d 785 (1999). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Masotto*, 73 F.3d 1233, 1238 (2d Cir.1996) (quotation omitted). Unless the error is harmless, a new trial is required. *Id.* When evaluating whether the error was harmless, the court must "appraise the significance of the error ... by comparing the instructions actually given with those that should have been given." *Salameh*, 152 F.3d at 142 (quoting *Dove*, 916 F.2d at 45); *see also United States v. Howard*, 506 F.2d 1131, 1134 (2d Cir.1974) ("[i]f justice is to be done in accordance with the rule of law, it is of paramount importance that the court's in-

structions be clear, accurate, complete and comprehensible, particularly with respect to the essential elements of the alleged crime that must be proved by the government beyond a reasonable doubt.") (quoting *United States v. Clark*, 475 F.2d 240, 248 (2d Cir.1973)).

■ In this case, evidence of the defendants' intoxication was introduced at trial, the majority of which came directly from the testimony of Stephanie Vincent. There was evidence that the party at Kings Point Park was a "rugby drink-up" and that the purpose of going to the park on a Saturday night was to drink. T. 621, 750. Crowley, Vincent, Bechtel, Carroll, Bonnar, and Andrea Peer were at the park that night. T. 74, 450–51, 501, 503, 621. Vincent drank one or two beers. T. 76, 450. Bechtel drank four or five beers. T. 501, 503. Bonnar became intoxicated. T. 622. Peer became "very intoxicated" and had to be helped back to the Academy. T. 78, 172. Crowley had marijuana in his possession at the park, gave some of it to Bechtel and Hardesy, and was present when Bechtel and Hardesy smoked it. T. 505–06.

Additionally, at approximately 5:00 a.m. on a Sunday morning, the day before final exams were to begin, Crowley persistently begged Bechtel to go party and smoke crack with him. T. 85–86. He also requested that Vincent go party, go out, do drugs, and smoke crack with him. T. 96–97. Crowley pulled a plastic bag out of his pocket to show it to Vincent, and told her that she was going to "miss out on this." T. 98. At this time, Crowley was acting very hyperactive. T. 102, 192, 194, 323, 377. Crowley was agitated and distracted. T. 102. Crowley appeared to Vincent to be intoxicated or stoned. T. 302–03, 294. Carroll later told Crowley that "drugs don't give you the excuse for you—what you did." T. 456, 943–44.

Furthermore, during the period between 4:51 a.m. and 6:12 a.m. on Sunday, September 28, 1997, Valjato was lethargic, very slow and concentrated. T. 102–03.

When Vincent first saw Valjato, he was outside her room, seated on the floor, head against his knees, leaning against the door frame. T. 84, 196. Valjato later begged Vincent to go out and party with him and Crowley. T. 97. Valjato pulled a plastic bag from his pocket and showed Vincent what appeared to be marijuana. T. 98–99. Valjato asked Vincent if the two could do drugs in her room. T. 100. Later, apparently responding to Crowley, Valjato entered Vincent's room and attempted to climb up to Vincent's bed, but he slipped, and despite his size and apparent athletic ability, was not able to perform this task. T. 111. A few days after the incident, Crowley told Rodriguez that Valjato had been "fucked up." T. 666. Valjato later told Rodriguez that he knew little about what had happened early Sunday morning because he was "all fucked up." T. 670.

Finally, following the incident, Vincent told Johnsen that she suspected that Crowley and Valjato had been doing drugs the night of the incident. T. 740–41. It also was very apparent from the testimony that both defendants, particularly Crowley, persisted in asking Vincent for permission to perform oral sex on her well past the point where any lucid human being would have stopped and left the room. T. 106–120.

Having reviewed the testimony at trial, the Court concludes that it erred in refusing to charge the jury on the defendants' voluntary intoxication. It is clear that there was sufficient evidence that both defendants exhibited signs of impairment and may have been intoxicated. Indeed, the complaining witness herself expressed the view that the defendants were either intoxicated or stoned, and a short time later expressed this opinion to her friends.

There is no doubt that the attempt crimes charged in Counts One and Two of the indictment are specific intent crimes. *United States v. Boyles*, 57 F.3d 535, 541–42 (7th Cir.1995) (assuming without deciding that attempted aggravated sexual

abuse is specific intent crime); *United States v. Sneezer,* 900 F.2d 177, 180 (9th Cir.1990) (attempted sexual abuse requires proof of specific intent to accomplish act that constitutes the completed offense). Evidence of intoxication, while not a legal defense, may negate the existence of the defendant's specific intent to perform the crime charged. *See United States v. Rahman,* 189 F.3d 88, 142 (2d Cir.1999) (expressly approving of jury charge stating that "intoxication may, under some circumstances, negate the existence of the defendant's intent to commit the crime"); *United States v. Briseno–Mendez,* 153 F.3d 728, 1998 WL 440279, at *11 & n. 9 (10th Cir. July 17, 1998) ("[a] defendant is not guilty of a specific intent offense if voluntary intoxication prevented the defendant from forming the requisite specific intent") (unpublished disposition); *Boyles,* 57 F.3d at 541 (referring to voluntary intoxication as a "negative defense" which can "render the defendant incapable of attaining the required state of mind to commit the crime"); *United States v. Zink,* 612 F.2d 511, 515 (10th Cir.1980) ("[w]hile voluntary drunkenness does not constitute a criminal defense per se, it may prove a mental incapacity to form a specific intent").

The government does not directly attack the argument that the defendants were intoxicated, but rather contends that the evidence at trial failed to demonstrate that either defendant was "under that degree of inebriation that he had no power of reason or was utterly incapable of knowing that he was attempting forced oral sex and penetration of her vagina." Government's Memorandum of Law, at 16. The government also argues that neither defendant presented a lack of specific intent defense, and therefore the Court was correct in refusing to instruct the jury on intoxication. *Id.* at 18.

However, these arguments fail to address the Second Circuit's longstanding

mandate that criminal defendants are "entitled" to have an instruction on "any theory of defense for which there is any foundation in the evidence." *Diaz,* 176 F.3d at 98. This mandate applies "no matter how tenuous" the defense appears to the Court or to the government. *Evangelista,* 122 F.3d at 116.

With this authority in mind, the Court determines that its jury instructions were erroneous to the extent that the jury was not charged on voluntary intoxication, because the jury was not adequately informed on the law. *See Masotto,* 73 F.3d at 1238. Moreover, the error was not harmless because the voluntary intoxication defense directly targets an essential element of the government's burden of proof: specific intent to commit the attempt crimes alleged. *See Howard,* 506 F.2d at 1134. The evidence of intoxication in this record was sufficient to permit the jury to infer that the defendants were, in fact, intoxicated, and as a result of this impairment, that the defendants lacked the ability to form the specific intent to commit the crimes of attempted aggravated sexual abuse, sexual abuse, and aiding and abetting. If accepted by the jury, these inferences would have required the jury to acquit the defendants of the crimes alleged.

Therefore, the motion for a new trial is granted as a result of the Court's failure to charge the jury on voluntary intoxication.[18]

## II. Motions of Defendant Steven Valjato

### A. Sufficiency of the Evidence

■■■ The Court concurs with Valjato's assessment that his involvement in these events was minimal. However, viewing the evidence in the light most favorable to the government, and drawing all permissible inferences in the government's favor, the Court cannot say that no rational trier of fact could have found the

18. Thus, in the event that the indictment is ordered to be reinstated by an appellate court, the failure to instruct the jury on voluntary intoxication nevertheless would entitle the defendants to retrial under the present indictment.

essential elements of the crimes charged beyond a reasonable doubt. *See Jackson,* 443 U.S. at 318–19, 99 S.Ct. 2781. Due deference must be given to the jury's determination, even if the Court itself "concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible." *Guadagna,* 183 F.3d at 129 (internal quotation omitted).

With this standard in mind, the evidence was sufficient to show that Valjato, at the very least, aided and abetted an attempt to cause Vincent to engage in a sexual act by using force or by placing her in fear. *See* 18 U.S.C. §§ 2241(1) and 2242(1). The evidence shows that Crowley attempted to get in bed with Vincent while kissing Vincent's neck and rubbing her breasts. T. 106. Vincent told him to stop, but Crowley persisted and used even more force as she resisted. T. 107. This struggle continued for five to ten minutes, with Crowley begging to go down on Vincent while she tried to fight him off. T. 292–93, 305. The bed creaked noisily during this period. T. 399.

Toward the end of this time frame, Crowley moved his hand down Vincent's shorts, gripped and groped her vagina, and attempted to insert his finger. T. 108–09. After Vincent called to her roommate for help, Crowley called to Valjato. T. 108–09, 348. Valjato responded within seconds. T. 110. When Valjato entered, Crowley still had his hand down Vincent's shorts, was still touching her vagina, and had his arm across Vincent's chest. T. 110, 112. Valjato attempted to climb up onto the desk and then into Vincent's bed while asking Vincent to let the two perform oral sex on her. T. 111–22. Vincent was intimidated. T. 114.

The two remained at Vincent's bedside for an unknown period of time, continuing to beg Vincent to allow them to go down on her. T. 116. While the two stood on the desk, Crowley attempted to pull down Vincent's shorts. T. 116–17. As he attempted this act, Crowley said "no, she is going to do that." T. 117. Valjato told Vincent that he had a tongue ring and she would enjoy it. T. 117. He told her that nobody had ever turned him down. T. 118. Vincent felt threatened by Valjato's angry words and tone. T. 118. She continued to say "no." T. 119

Despite Vincent's continued rejection of their pleas, Crowley and Valjato kept it up, asking Vincent for a reason why she would not let them perform oral sex on her. T. 118. Over and over, the two kept saying "please let [us] go down on [you]." T. 119. Valjato's voice got louder as he continued to ask Vincent to allow him to perform oral sex on her. T. 522. Finally, Valjato angrily told Crowley that "if she was not going to fucking do it, let's fucking go." T. 119. Valjato punctuated his remarks by hitting his fist against the bed frame. T. 119. Valjato then told Vincent that she better not ever say anything about what had happened in the room that night. T. 120. Bechtel testified that she heard Valjato tell Vincent that if she ever said anything, he would come and find her. T. 524.

While Vincent testified that Valjato never touched her during this incident, no touching is required to complete the act of aiding and abetting an attempt to cause another to engage in a sexual act by the use of force or fear. From the evidence presented, a rational jury could have believed or inferred that Valjato participated in an attempt to cause Vincent to engage in a sexual act through the use of force or fear and that he wished to bring about her compliance with the oral sex request. Moreover, the jury could have inferred that Valjato's rapid response to Crowley's call indicated that he knowingly and willfully sought to join with Crowley's attempts. Valjato's continued presence at the bedside, along with his repeated requests and other statements indicated his desire to associate himself with the criminal venture.

Finally, Valjato's attempt to climb into the bed, the references to his tongue ring, his opinion that Vincent would really enjoy

it, and his statement that nobody ever had turned him down, could have indicated to the jury that he sought by his actions to make the criminal venture succeed. In sum, a rational jury could have concluded, beyond a reasonable doubt, that Valjato's actions and words indicated both his knowing association with the attempt and his intention that the sexual act actually would be completed.

While it is certain that the jury *could* have resolved these issues in Valjato's favor, it did not. *See Jackson,* 443 U.S. at 326, 99 S.Ct. 2781 (when faced with facts supporting possible conflicting resolutions, courts must presume that such conflicts were resolved in favor of the prosecution). Therefore, the Court cannot say that no rational trier of fact reasonably could have found the essential elements of the crimes charged beyond a reasonable doubt. *See id.* at 326, 99 S.Ct. 2781.

Valjato's motion for a judgment of acquittal based on the insufficiency of the evidence presented at trial must be denied.

### B. Juror Confusion

It has long been part of our jurisprudence that consistency in verdicts is not required. *Hamling,* 418 U.S. at 101, 94 S.Ct. 2887. In other words, a comparison of what the jury did and did not do, including a review and analysis of the verdict's consistency or inconsistency, is foreclosed under applicable law. The Second Circuit has held that "jury verdicts are not to be reviewed for consistency." *United States v. Jespersen,* 65 F.3d 993, 998 (2d Cir.1995) (citing *United States v. Powell,* 469 U.S. 57, 61–69, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984)). In *Powell,* the Supreme Court affirmed the conviction of a defendant who was *acquitted* of (1) conspiracy to possess cocaine and (2) possession of cocaine, but *convicted* of using the telephone to facilitate those offenses. *Powell,* 469 U.S. at 69, 105 S.Ct. 471.

According to the Second Circuit, *"Powell* explained that 'the Government's inability to invoke review, the general reluctance to inquire into the workings of the jury, and the possible exercise of lenity suggest that the best course to take is simply to insulate jury verdicts from review on this ground." *Jespersen,* 65 F.3d at 998 (quoting *Powell,* 469 U.S. at 68–69, 105 S.Ct. 471) (internal ellipses omitted). Therefore, "sufficiency of the evidence is reviewed independently for each count, ignoring the jury's determination that evidence on another count was insufficient." *Jespersen,* 65 F.3d at 998 (quotation omitted).

█ The jury in this case returned a verdict acquitting the defendants of any unlawful sexual contact,[19] but convicting them of attempted aggravated sexual abuse, attempted sexual abuse, and/or aiding and abetting such attempts. Although the verdict in this case was somewhat irregular, the verdict nevertheless is, for all practical purposes, inviolable. Under the relevant authority, any inconsistencies in the jury's verdict, real or imagined, must be ignored. Thus, Valjato's motion for a judgment of acquittal or for a new trial cannot be granted on this ground.

### C. Constructive Amendment of the Indictment

Valjato also asserts that there was a constructive amendment of the indictment because the configuration and wording of the verdict sheet was misleading and the language of the verdict sheet did not match the titles contained on the indictment. These arguments are without merit. The verdict sheet and the indictment substantively were practically identical. Moreover, Valjato made no objection at trial to the wording or configuration of the verdict sheet. On this ground, the motion is denied.

To the extent that Valjato joins in Crowley's claim that a constructive amendment

---

**19.** The statutory definition of "sexual contact" is reproduced in the Background sec-
tion, *supra.*

of the indictment occurred, the Court declines to rule on the motion for the reasons stated in Part I.A.2., *supra.* The Court has considered and rejected the remaining arguments raised by Valjato.

### CONCLUSION

For the reasons discussed above, the defendants' motions are granted in part and denied in part, and the indictment will be dismissed. Defendants are directed to submit a joint proposed order of judgment which reflects the Court's holding no later than December 20, 1999. The parties are further directed to appear at a status conference to be held on Friday, January 7, 2000, at 9:15 a.m.

### JOINT ORDER OF JUDGMENT

This cause having been heard on October 29, 1999, on the post-trial motions of defendants, Francis Crowley and Steven Valjato for a judgment of acquittal and dismissal of the indictment, Debra Newman, Assistant United States Attorney for the Eastern District of New York, appearing on behalf of the United States of America, and opposing both arguments, Edward M. Shaw, Esq., appearing on behalf of the defendant, Francis Crowley, and Thomas F. Liotti, Esq. and Floyd T. Ewing, III, appearing on behalf of defendant, Steven Valjato.

Having read and heard the motions of the defendants, the memorandum of points and authorities submitted in support thereof, the opposition thereto, the arguments of counsel, and having fully considered same; and the Court having issued a Memorandum and Decision thereon dated December 13, 1999 and incorporated herein by reference; and the defendants' application having been granted, it is

**ORDERED** that the Indictment against both defendants in the above-captioned action be, and it is hereby, dismissed.